

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **TARY MESEBERG (NKA VANDERPOOL),** | ) |
| | ) |
| | )   **WD82009** |
| **Respondent,** | ) |
| | ) |
| | )   **OPINION FILED:  June 25, 2019** |
| **v.** | ) |
| | ) |
| **STEVEN LEE MESEBERG,** | ) |
| | ) |
| **Appellant.** | ) |

**Appeal from the Circuit Court of Caldwell County, Missouri**
The Honorable J. Bartley Spear, Jr., Judge

Before Division One:  Victor C. Howard, Presiding Judge, Lisa White Hardwick, Judge
and Gary D. Witt, Judge

Steven Meseberg ("Father") appeals the judgment from the Circuit Court of
Caldwell County, Missouri denying his motion to modify and granting in part Tary
Meseberg's ("Mother") cross-motion to modify.  Father argues that the motion court abused
its discretion in giving Mother sole legal custody of their minor child ("Daughter") because
it was against the weight of the evidence.  Father argues that once joint legal custody has
been granted, Missouri law only allows a court to modify custody to grant sole legal
custody to the parent that is more likely to allow the child to have frequent, continuing, and

meaningful contact with the other parent. Father argues that for the court to determine that Mother was the parent more likely to allow Daughter frequent, continuing, and meaningful contact with the other parent was against the overwhelming weight of the evidence and the court should have granted Father sole legal custody. We affirm.

## Statement of Facts

This case has a long and tortured history. Father and Mother were married in January 2004, the marriage was dissolved in November 2007 and the dissolution judgment was entered March 2008. Daughter, born in July of 2005, was the sole child born of the marriage. The original dissolution judgment provided for joint legal and physical custody, with Mother's address being designated for mailing and educational purposes. That judgment also provided Mother "final say on all issues and decisions that cannot be resolved by agreement of the parties."[1] In March 2010 Father filed a motion to modify and for contempt. A trial was held on that motion and the court modified the original dissolution judgment on January 28, 2011 ("2011 Judgment").[2] The custody arrangement provided for in the 2011 Judgment was the subject of the current cross motions to modify.

Under the 2011 Judgment, the parties were awarded joint legal custody and joint physical custody of Daughter. Mother's address was designated as the address of Daughter for educational and mailing purposes. Each party was awarded specific parenting time

---

[1] The dissolution judgment was not appealed by either party and we do not opine as to whether or not this arrangement fell within the legal parameters of joint custody based on Mother having final say on all disputed issues involving the child.

[2] No appeal was taken by either party of this judgment.

2

with Daughter.  As to the final decision making authority regarding Daughter, the 2011 Judgment provided:

> **3.  Confer on Major Issues:**  The parties will confer with one another in the exercise of the decision making rights, responsibilities and authority and have an equal voice on issues regarding said child's training, education and rearing, including, without limitation: the choice or change of school, college or vocational training, major summer activity programs, music, art, dance or other cultural lessons, child care providers, psychological or psychiatric treatment or counseling, doctors, surgeons and all other material decisions affecting the health, education or welfare of said child.  **However, in the event that the parties cannot agree, the Petitioner shall have the discretion to make the final decision regarding said issues.**

(emphasis added).

Mother resides in Braymer, Missouri and Father resides in Cameron, Missouri. Daughter has always attended the school district in Braymer.  Father was ordered to pay child support to Mother in the presumed amount pursuant to the child support guidelines under Rule 88 and Form 14 of $444 per month.

In the 2011 judgment, Mother was also found in contempt for willfully disobeying the court's lawfully issued orders in these respects:

> She did not confer with [Father] on material decisions affecting the child's training, education, and rearing; she called [Father] an abusive name in the presence of the child; she did not notify [Father] of her part time employment at the McDonalds of Chillicothe; and she did not participate in an anger control program. [Mother] did not in so doing, however, unreasonably deny or interfere with [Father]'s custody.

As a result of the finding of contempt, Mother was required to participate in counseling and an anger control program.

In May 2015, following Daughter's appointment with counselor Lesley Johnson ("Johnson"), Johnson made a hotline call to Children's Division because she was concerned

3

about Daughter reporting that Father sometimes slept in the same bed as Daughter. On May 13, 2015, Mother filed for a child order of protection, made a police report against Father and refused to allow Father to have any parenting time with Daughter. A forensic interview was conducted with Daughter. Father was also interviewed by the Children's Division.

Following an investigation the Children's Division determined the allegations against Father were unsubstantiated. Mother was informed of this determination. Mother continued to refuse to allow Farther to see Daughter for five months while the child protection order was still pending but before the final hearing on it.

May 19, 2015, Father filed a motion to modify seeking the court to modify the parties' custody and support of Daughter. Father sought sole legal and sole physical custody of Daughter, with his address designated as Daughter's for educational and mailing purposes. Mother filed a cross-motion to modify requesting sole legal and sole physical custody of Daughter. A Guardian ad Litem ("GAL") was appointed to represent Daughter's interests.

On June 5, 2015, Father filed a family access motion because of Mother's continued refusal to allow Father to see Daughter during his usual parenting time after the hotline call to Children's Division. In October 2015, the court held a hearing on Father's family access motion. The court took the matter under advisement at that time and later indicated it would defer ruling on the family access motion until the cross motions to modify were

4

ready for disposition.[3] On October 30, 2015, the court consolidated Father's family access motion with the modification case and ordered the parties' to continue counseling and Father to have unsupervised parenting time during the day on every other Saturday, on Thanksgiving, and on Christmas.

On October 2016, Mother moved the court to order a psychological evaluation of Father and requested the court to appoint Dr. Aileen Utley ("Dr. Utley") to conduct the evaluation. The court sustained Mother's motion but ordered both parties to have a parenting assessment performed by Dr. Utley. Dr. Utley conducted a parental assessment of Mother in December 2016 and of Father in February 2017. Dr. Utley wrote a report about each, which were admitted into evidence.

The court held a trial over three days in December 2017.

The court interviewed Daughter in chambers. Daughter told the court that she would like to stay in the Braymer school district. She also said she would like to spend more time with her dad because the weekend is not very much time.

The evidence at trial established that there was a complete lack of cooperation or communication between Father and Mother. The communication they did have was acrimonious with both focused on themselves and not on the best interests of Daughter. The parenting plan in effect did not provide for specific hours for Father's parenting time during holidays, so Mother unilaterally determined when Father was allowed to see Daughter on those holidays. Mother did not keep Father informed as to significant events

---

[3] The trial court noted in its final judgment that when it made this decision, it had no way to know that the parties would take over two years to be ready for trial on the cross motions to modify.

in Daughter's life.  In September 2011 Mother informed Father that Daughter was to be baptized the following Sunday even though she had been aware this was going to happen for some time.  Mother consistently signed Daughter up for extracurricular activities that conflicted with Father's parenting time without consulting him or informing him.  In May 2013, Mother signed Daughter up for summer school and did not inform Father until two weeks before it was to begin, one week of which was during one of his weeks of uninterrupted parenting time that summer.  On other occasions Mother signed Daughter up for other activities without his knowledge that interfered with his parenting time and informed him by e-mail after Daughter was committed to the activity.  Father objected to Daughter being involved in any extracurricular activities that might interfere with his parenting time.

Father testified that he was currently not interested in relocating to Braymer and would like to have primary custody and change Daughter's school and community to Cameron.  Father testified Daughter would have opportunities to join extracurricular activities in Cameron.

Mother testified that after the hotline call to the Children's Division she noticed behavioral changes in Daughter around Christmas 2014.  Mother testified that Daughter started not wanting to go to Father's home and would start getting anxious beginning on Wednesday before his weekend parting time.  Mother testified that Daughter lost seven pounds the winter of 2015.  In April 2015, Mother took Daughter to see Dr. Dorothy Milburn ("Dr. Milburn") for a respiratory infection.  Mother testified that during the appointment Daughter told Dr. Milburn she was having some difficulties with her Father

6

and had anxiety about going to see Father. Dr. Milburn's notes showed that Daughter had anxiety and was afraid of Father.

Father testified that prior to the hotline call, he was never made aware of Daughter's behavior or her not wanting to go to his house. In regard to the allegation that he slept in the same bed with Daughter, Father testified that he read Daughter bedtime stories and as soon as Daughter fell asleep he would go to his room, which he shared with his wife. Father's wife also refuted any allegation that Father ever slept in the same bed with daughter or had engaged in any inappropriate behavior with Daughter.

Johnson testified regarding her counseling appointments with Daughter. Johnson testified that Daughter told her that Father would get in bed with her, wrap his arms around her so she could not move, and that she felt something hard on her back but was too frightened to move. Daughter told her that she would wait till Father was asleep and then go sleep in a chair in the living room. Daughter told her that she would try to wake up before Father woke up and get back in bed because she knew he would be angry otherwise. Following the session with Daughter, Johnson made the hotline call to Children's Division.

In December 2016, Father and Mother began co-parent counseling with Saundra Sheppard ("Sheppard"). Sheppard testified that she met with Father and Mother together and separately but never met with Daughter. Sheppard testified that Mother and Father have significant communication issues and issues regarding Daughter being involved in too many extracurricular activities that interfere with parenting time. During this counseling Mother and Father agreed that Daughter would only be involved in two extracurricular activities at any given period of time but that agreement never was

7

implemented. Sheppard ended the counseling sessions in April 2017 because she felt that no progress was being made.

On April 3, 2018, the trial court entered its final judgment. The court sustained Father's family access motion finding that:

> By the time of trial, the parties agreed, and the court believes, [Father] did not sexually abuse the child. But, to paraphrase the Guardian ad Litem's testimony from the Family Access Motion hearing, it is hard to fault [Mother] for initially acting the way she did (back in 2015) based upon what [Mother] was told. Whatever the cause, and frankly the court is unsure, the child's feelings for uncomfortableness and manifestations of anxiety about going to see [Father] were real. In fact, it took extensive counseling to address those issues. Having said that, after the Children's Division determined the allegations were unsubstantiated and that child was safe in [Father]'s home, [Mother] should have immediately done more than she did to actively comply with the court's existing order. The court does fault her for that.

The court ordered Mother to pay Father a fine of $500 and awarded Father $759 in attorney's fees based on the family access motion.

The court denied Father's motion to modify and granted Mother's cross-motion to modify in part. The court continued joint physical custody of Daughter but provided Mother with sole legal custody. The court did not modify the child support award.[4] In its final judgment the court made findings regarding the factors listed in section 452.375.2[5]. The trial court's findings regarding each factor are discussed below.

The trial court noted that both parties acknowledge that joint custody has not worked between them and both requested that the joint custody arrangement be terminated in favor

---

[4] As neither party challenges this finding on appeal we omit the evidence regarding the child support calculation.

[5] All statutory citations are to RSMo 2016, as updated through the 2017 supplement, unless otherwise indicated.

of sole custody. The court further found that both parties "came before this court with soiled hands in their complaints about the other" and the issues between them are the types of issues that are resolved without court intervention by overwhelming majority of divorced couples with "a little give and take." The court found that the parties were unable to cooperate in implementing the existing parenting plan and found that it was necessary to adopt a new and more detailed parenting plan which it adopted as part of its judgment ("Parenting Plan").

The Parenting Plan required both parents to keep the other informed as to Daughter, including as to medical and school records, but gave Mother "sole legal responsibility" for Daughter's "care, custody, and control … including but not limited to making all major decisions affecting [Daughter's] health, education, and welfare." The Parenting Plan gave Father parenting time on alternating weekends during the schoolyear, including Friday or Monday if Daughter did not have school that day, and from Thursday to Monday during the summer, and gave each parent three other uninterrupted non-consecutive weeks with Daughter during the summer. In discussing the Parenting Plan, the court noted that "[Father's] hyper technical reading of the 2011 Judgment of Modification coupled with his belief parenting time trumps all other considerations, e.g. child's extracurricular activities, has created conflict where none should exist." The court also noted that with the exception of gymnastics, which Daughter no longer participates in, the extracurricular activities of Daughter did not strike the court as being unusual or extraordinary.

Father filed a motion to amend the judgment to give him sole legal custody of Daughter and designate his address as Daughter's for educational and mailing purposes.

9

The trial court took no action on that motion which was denied by operation of law after 90 days. This appeal followed.

## Standard of Review

> Upon review, we will affirm the trial court's judgment unless it is not supported by substantial evidence, or it erroneously declares or applies the law. *Markowski v. Markowski*, 736 S.W.2d 463, 465 (Mo. App. W.D. 1987) (internal citation omitted). We give deference to the trial court's judgment on the credibility of witnesses and the weight given to opposing opinion evidence. *Id.* at 465.

*Almuttar v. Almuttar*, 479 S.W.3d 135, 138 (Mo. App. W.D. 2016).

"[T]he trial court's judgment is presumed valid. . . ." *Adams v. Adams*, 51 S.W.3d 541, 546 (Mo. App. W.D. 2001). "[W]e defer to the trial court's findings of fact on contested factual issues" and defer to the trial court's credibility determination when determining whether a trail court's judgment is against the weight of the evidence. *Hughes v. Hughes*, 505 S.W.3d 458, 467 (Mo. App. E.D. 2016). "A judgment is against the weight of the evidence only if the trial court could not have reasonably found, from the evidence at trial, the existence of a fact that is necessary to sustain the judgment." *Id.* In order to succeed on an against the weight of the evidence challenge we must be firmly convinced that the judgment is wrong. *Id.*

> An against-the-weight-of-the-evidence challenge presupposes the existence of substantial evidence to support the outcome--that is, the argument presumes there was some evidence with "probative force on each fact necessary to sustain" it. *Holm v. Wells Fargo Home Mortgage, Inc.*, 514 S.W.3d 590, 596 (Mo. banc 2017). In an against-the-weight-of-the-evidence challenge, we may consider a narrow category of evidence contrary to the judgment: evidence, where the effect "is legal, and there is no finding of fact to which [w]e defer." *White*, 321 S.W.3d at 308. In other words, evidence of such a nature that the only "question before the appellate court is whether the trial court drew the proper legal conclusions" therefrom. *Id.*

10

The significant burdens an appellant faces in bringing an against-the-weight-of-the-evidence challenge are well express in our Supreme Court's opinion in *Ivie v. Smith*, 439 S.W.3d 189, 205-06 (Mo. banc 2014):

> Appellate courts act with caution in exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence.  A claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment.  In other words, 'weight of the evidence' denotes an appellate test of how much persuasive value evidence has, not just whether sufficient evidence exists that tends to prove a necessary fact. *See White v. Dir. of Revenue*, 321 S.W.3d 298, 309 (Mo. banc 2010) (stating that 'weight' denotes probative value, not the quantity of the evidence). The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong.
>
> When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations.  A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment.  When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence.
>
> This Court defers on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case.  The circuit court is able to judge directly not only the demeanor of witnesses, but also their sincerity and character and other trial intangibles that the record may not completely reveal.  Accordingly, this standard of review takes into consideration which party has the burden of proof and that the circuit court is free to believe all, some, or none of the evidence offered to prove a contested fact, and the appellate court will not re-find facts based on credibility determinations through its own perspective.  This includes facts expressly found in the written judgment or necessarily deemed found in accordance with the result reached. Rule 73.01(c). Evidence not based on a credibility determination, contrary to the

11

circuit court's judgment, can be considered in an appellate court's review of an against-the-weight-of-the-evidence challenge.

*Id.* (internal quotation and citation omitted).

These principles are reflected in the four-step analytical sequence for against-the-weight-of-the-evidence challenge set forth in *Houston*, 317 S.W.3d at 187, directed that such challenge:

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2) identify all the favorable evidence in the record supporting the existence of that proposition;
>
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
>
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

> *Id.*

*In re Schubert*, 561 S.W.3d 787, 795-96 (Mo. App. S.D. 2018).[6]

## Analysis

Father raises one point on appeal. In his sole point on appeal Father argues that the trial court abused its discretion in giving Mother, rather than Father, sole legal custody of Daughter because it was against the weight of the evidence to determine that Mother was the parent more likely to allow Daughter frequent, continuing, and meaningful contact with

---

[6] We note that Father does not even attempt to set forth the four step analysis for an against the weight of the evidence challenge or apply the facts of this case to that analysis. Further, his statement of facts fails to recognize our standard of review and set forth the facts in the light most favorable to the trial court's judgment. However, we choose to exercise our discretion and gratuitously address his point on appeal.

12

the other parent, and under Missouri law, sole legal custody can only be given to the parent more likely to allow such contact with the other parent.

Missouri statutes are clear that in deciding the custody arrangement that would serve the best interest of a child, the trial court shall consider all relevant factors and enter findings of fact and conclusions of law, including specifically the following factors:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence as defined in section 455.010 has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that bests protects the child and any other child or children from whom the parent has custodial or visitation rights, and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian. The fact that a parent sends his or her child or children to a home school, as defined in section

13

167.031, shall not be the sole factor that a court considers in determining custody of such child or children.

Section 452.375.2.

In reviewing a trial court's custody determination "we presume that the trial court reviewed all the evidence and awarded custody in the manner it believed would be in the best interests of the children." *Lalumondiere v. Lalumondiere*, 293 S.W.3d 110, 116 (Mo. App. E.D. 2009). This presumptions arises from the trial court's position to better determine "not only the credibility of the witnesses and parties directly but also their sincerity, character, and other trial intangibles which might not be completely revealed by the record." *Id.* "Additionally, because the trial court has an affirmative duty to determine what is in the best interests of the children, we presume that the custody decision is motivated by what the court believes is best for the children." *Keel v. Keel*, 439 S.W.3d 866, 875 (Mo. App. E.D. 2014).

Father argues that the trial court erred in finding that section 452.375.2(4), "[w]hich parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent," favored Mother. Father argues that this determination is against the weight of the evidence since the only evidence that Mother was the parent more likely to allow Daughter frequent, continuing, and meaningful contact with the other parent was Mother's testimony. Father argues that the motion court's determination is based solely on Mother's testimony that Father said during counseling that he could not think of any redeeming quality Mother had as a parent and the fact that she has not openly defied the court since October 2015. Father argues that there was no evidence that he has ever

14

interfered with Mother's custody. Father further bases this argument on the fact that Mother kept Daughter away from Father even after abuse allegations against Father were determined to be unfounded and Mother continued to enroll Daughter in extracurricular activities that interfered with Father's parenting time. Father argues that sole legal custody can only be given to the parent whom the fourth factor favors.

For the fourth factor, "which party is more likely to allow the child frequent, continuing and meaningful contact with the other," the trial court found that both parties had "soiled hands" and that both parties have antipathy for each other, with Father's antipathy towards Mother being stronger. The court found this factor to favor Mother as the parent most likely to allow child frequent, continuing, and meaningful contact with the other, while admitting it was a close call. The court also noted in granting the family access motion, that such a finding may be inconsistent with their finding that factor four favors Mother but noted it considered Mother's noncompliance as well as evidence Father does not believe Mother has any redeeming qualities as a parent and Mother's compliance since 2015.

The trial court listened to and evaluated the testimony from both Father and Mother as well as the other witnesses. The trial court noted and considered in making its decision Mother's noncompliance with the parenting plan in 2015. However, the trial court is not limited to a consideration of this time period in isolation. The trial court also noted that both parties had contempt for the other and Father's contempt seemed to be stronger. The trial court noted that both had unclean hands and Mother has been in compliance with the court's orders since 2015. Also, the trial court in its judgment noted that it did not find the

15

amount of extracurricular activities participated in by Daughter to be abnormal. While the trial court found this factor to favor Mother, the trial court acknowledged what a close call it was. The fact that Mother did not allow Daughter to see Father in early 2015 was considered by the trial court along with all the other evidence. The court specifically noted that based on the counselor's hotline call regarding Father's alleged abuse of Daughter, "it is hard to fault Petitioner for initially acting the way she did (back in 2015) based upon what Petitioner was told." The court did fault Mother for continuing to withhold parenting time from Father after the allegations were found to be unsubstantiated. This one finding based on this one piece of evidence taken in solitude does not render the trial court's findings regarding custody against the weight of the evidence.

Further, Father argues that a finding of sole custody can only be granted to the parent in whose favor the fourth factor is found, as this factor is the determinative factor. Father relies on *Dent v. Dent*, 965 S.W.2d 230 (Mo. App. W.D. 1998) for support of this proposition. We find Father's argument to be in error. This Court in *Dent* found that the "[a]pplication of factors (3)-(6) [and factor 8] support the conclusion that the best interests of the children require awarding Father their sole custody." *Id.* at 238. While this Court found that the father in that case was the parent more likely to permit the children frequent and meaningful contact with the other parent because mother had removed the children from father's home and restricted his visitations, this Court also found that "Father was a stable, capable and temperate individual while Mother was irresponsible and incapable of effectively caring for the children" because of mother's significant financial difficulty, allowing the children to be continually dirty, and drinking alcohol with her various

boyfriends and her minor brother in the presence of the children. *Id.* at 238-239. In *Dent*, this Court did not solely rely on the factor regarding which parent is more likely to allow the child frequent and meaningful contact with the other parent as Father argues. The court did, properly consider that factor as well as all of the other applicable factors contained in section 452.375.2 in determining that the trial court erred in awarding the mother sole custody in that matter. Father's arguments based on *Dent* herein are misplaced and disingenuous.

The factors set forth in the statute are "not a score card where each party gets points toward the goal of 'winning'" but it is rather "a balancing that the trial court must do in the Solomonesque attempt to determine what is in the best interests of the child when the parties are not able to get along and work well enough together to accomplish this on their own as the parents of that child." *Cerna-Dyer v. Dyer*, 540 S.W.3d 411, 418 (Mo. App. W.D. 2018) The fourth factor, addressing which parent is more likely to allow the child frequent, continuing, and meaningful contact with the other parent, is not the only factor to be considered by the trial court and this one factor is not outcome determinative. There were seven other factors that the trial court weighed in making its ultimate determination that Mother should have sole legal custody.

The trial court noted that both parties agree that joint custody is not working and found that the overwhelming evidence supported a finding that these parties were incapable of doing what is necessary for a joint legal custody arrangement to be successful. The complete animus between the parties and complete lack of ability to communicate or put

17

the best interests of Daughter ahead of their own disagreements shows that joint legal custody was not an option in this case.

The trial court expressly stated that it had considered the factors set forth in section 452.375.2. While the judgment does not expressly tie each finding to a specific parent, the court nonetheless rendered sufficient findings on each of the factors to allow our review of its judgment.

As to the first factor, regarding the wishes of the parents, the trial court considered the parenting plans submitted by both parties and noted that both plans called for termination of joint legal custody. As to the second factor, "[t]he needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child," the trial court found that both parents had the ability and were willing to actively perform their functions as mother and father. As to the third factor, "[t]he interaction and interrelationship of the child with persons who may significantly affect the child's best interests," the trial court found that the child had some issues in her relationship with Father but those issues did not require any significant change in parenting time. It can be inferred that this factor favored Mother as the only finding made were the issues with Daughter's relationship with Father.

As to the fifth factor, "[t]he child's adjustment to home, school, and community," the trial court found that Daughter was very well adjusted to her home, school and community. Again, it can be inferred that this factor favored Mother as this is the same home, school, and community she shares with Mother and Father testified that he was

18

currently not interested in relocating and would like to change Daughter's school and community.

As to the sixth factor, "[t]he mental and physical health of all individuals involved, including any history of abuse of any individuals involved . . . ," the trial court found that after its credibility determination of the various witnesses, neither party suffers from a mental disability or illness. The court also found that Father had not abused Daughter and that both parties agreed no abuse had occurred. As to the seventh factor, "[t]he intention of either parent to relocate the principal residence of the child," the trial court found that there was no evidence to indicate that either parent had any present intention to move from their current location. A change in custody to sole custody in Father would have resulted in a change in Daughter's principal residence. As to the eight factor, "the wishes of a child as to the child's custodian. . . ," Daughter told the court in its *in camera* interview that she did not wish to change her school or move to primarily live with Father in Cameron, the trial court found that the evidence militated against a significant change in physical custody.

In short, the trial court's finding regarding the fourth factor in section 245.375.2 was not against the weight of the evidence. The trial court clearly considered and weighed the evidence as to each of the factors, specifically regarding Daughter's adjustment to her home, school, and community, her preference to stay in her current home, school, and community, as well as each parties' ability and willingness to allow frequent, continuing, and meaningful contact with the other parent in making its ultimate determination in granting Mother sole legal custody. Having considered Father's argument, we are simply

19

not left with a firm belief that the trial court's judgment is wrong and in fact are convinced, based on the evidence, that the trial court's judgment was appropriate in all respects. This case fails to rise to the level of the rare case when we will grant relief on an against the weight of the evidence challenge. *Ivie*, 439 S.W.2d at 206. We find the trial court's judgment was not against the weight of the evidence and find no error.

Father's point on appeal is denied.

## Conclusion

The judgment of the trial court is affirmed.

_____
Gary D. Witt, Judge

All concur